OPINION OF THE COURT
 

 Fuchsberg, J.
 

 A duly enacted Town of Plattekill ordinance broadly forbids anyone other than those who reside or conduct an established business in the town from depositing within its boundaries any “garbage, rubbish or other articles originating elsewhere than in the Town”. The principal question we reach on this appeal is whether the ordinance, as applied, violates the interstate commerce clause of the United States Constitution (art I, § 8).
 

 This case is a sequel to one by which, in 1976, the town successfully sought to permanently enjoin the plaintiff, Dutchess Sanitation Service, Inc., from accepting refuse in violation of the ordinance. Dutchess, a State-licensed commercial carting and sanitary landfill company, until then
 
 *673
 
 had continued to operate a lawfully zoned 74 acre tract at which the now forbidden substances had long been received without regard to whether these emanated from in or out of the town.
 
 [1]
 
 In the 1976 litigation Dutchess’ challenge to the ordinance’s constitutionality was overruled
 
 (Town of Plattekill v Dutchess Sanitation,
 
 56 AD2d 150, affd 43 NY2d 662).
 

 However, when, some three years later, the United States Supreme Court, in
 
 Philadelphia v New Jersey
 
 (437 US 617), invalidated a New Jersey statute prohibiting the importation into that State of most out-of-State wastes, the appellant instituted the present suit. Its request for relief is cast in terms of vacatur of the existing injunction insofar as it affects refuse originating outside the State of New York.
 

 On cross motions for summary judgment, in the main Dutchess demonstrated the existence of admissible evidence sufficient to establish that out-of-State refuse carting firms, especially ones from neighboring Connecticut and New Jersey, were desirous of patronizing its landfill. This showing was not controverted. Special Term, though perceiving no principled distinction between the Plattekill ordinance and the invalidated New Jersey statute, and though voicing the opinion that the one imposed as constitutionally impermissible a burden on interstate commerce as did the other, nevertheless felt constrained to deny Dutchess’ motion on the ground of
 
 res judicata.
 
 Concordantly, it granted the town’s motion to dismiss. For its part, the Appellate Division, rejecting the
 
 res judicata
 
 rationale, and so reaching the merits, reasoned that the exclusion of “all wastes from out-of-town sources” was an “evenhanded ban”. On that basis, it affirmed (73 AD2d 300). While we agree that the-prior decision is no bar to the present action, in our view the application of the ordinance offends constitutional requirements.
 

 Preliminarily, it should be made clear that the earlier determination does not dictate the result in this case. Notwithstanding its denomination as “permanent”, a rela
 
 *674
 
 tive term in law as in life, when there has been a change in the conditions that originally justified the issuance of a continuing injunction, settled principles do not leave a court of equity without power to determine that the injunction’s survival, in all or in part, is no longer warranted (see
 
 People v Scanlon,
 
 11 NY2d 459, 463). It is also recognized that such an alteration in circumstances may be grounded on a change in the interpretation of applicable law
 
 (State of Pennsylvania v Wheeling & Belmont Bridge Co.,
 
 18 How [59 US] 421;
 
 Western Union Tel. Co. v International Brotherhood,
 
 133 F2d 955, 957). If, then, the injunction here demanded obedience to legislation whose constitutional validity is found to have been undermined by subsequent authoritative adjudications, vacatur or modification may be in order.
 

 Turning then to Dutchess’ contention that the town’s ordinance is repugnant to the commerce clause, we begin with by then Justice Cardozo’s oft-quoted observation, made in the context of a commerce clause case, that the Constitution “was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division”
 
 (Baldwin v G.A.F. Seelig
 
 (294 US 511, 523). To that end, the clause has been read to assure that the basic economic unit is the country at large, that in matters of interstate commerce there are no State lines and that no State may thwart these concepts by placing itself in economic isolation. The credo is that the future of our Nation depends not on how certain parts of it fare but on how it does as a whole.
 

 These interpretations hearken to the pragmatic political philosophy which guided the formation of our Nation. So fundamental is this unadorned and unqualified grant of Federal authority — “The Congress shall have Power * * * To Regulate Commerce * * * among the several States”— that the Supreme Court has taken the pains recently to reiterate that the clause not only invites Congressional regulation, but, even when the power to do so goes unexercised, it nonetheless restricts State regulation
 
 (Hughes v Oklahoma,
 
 441 US 322, 326;
 
 Philadelphia v New Jersey,
 
 437 US 617, 621-623,
 
 supra).
 
 Indeed, history takes any element of surprise out of these declarations. For, as is true of the
 
 *675
 
 privileges and immunities clause as well (US Const, art IV, § 2), the commerce clause was a primary tool in the framers’ conversion of the weak and failing central government the parochially oriented former colonies had maintained under the Articles of Confederation into a strong and united Nation under the Constitution (see
 
 Salla v County of Monroe,
 
 48 NY2d 514, 520-521;
 
 Hood & Sons v Du Mond,
 
 336 US 525, 533-534;
 
 Gibbons v Ogden,
 
 9 Wheat [22 US] 1, 209; Madison, The Federalist Nos. 41, 42; Tribe, American Constitutional Law, p 319; Hall, Constitutional Law, p 288; Kibble, State and National Power Over Commerce, pp 30-31).
 

 The product of this background is a broad definition of interstate commerce. Thus, in
 
 Philadelphia,
 
 the Supreme Court expressly rejected a “two-tiered definition of commerce” which, while advocating “
 
 ‘a
 
 very sweeping concept’ ” of commerce when supported by Congressional legislation, would have applied a narrower one where the clause itself was invoked to overturn a State enactment. At issue there was whether, in the absence of a Federal statute, the movement and deposit of refuse was commerce. The court’s reply was that commerce had but one definition under the clause: “Just as Congress had power to regulate the interstate movement of these wastes, States are not free from constitutional scrutiny when they restrict that movement”
 
 (Philadelphia v New Jersey,
 
 437 US 617, 621, 623,
 
 supra).
 
 This maxim as a guide, two salient principles emerge from the cases.
 

 One is that the clause protects against offending activities though, because these are carried out entirely within one State, their imposition on interstate commerce is only “indirect”. Thus, in
 
 Fry v United States
 
 (421 US 542, 547), wage increases “even for employees of wholly intrastate operations” were held to affect interstate commerce. Similarly, in
 
 United States v Women’s Sportswear Assn.
 
 (336 US 460, 464), a combination effectuated in Massachusetts to fix prices on services performed entirely in that State was found to be within the scope of the clause because the victimized customers were engaged in interstate commerce. And, in
 
 Wickard v Filburn
 
 (317 US 111, 127-128), the clause was invoked to protect the Federally supported na
 
 *676
 
 tional wheat market from the crop of an individual farmer grown in excess of quota, although only for on-the-farm consumption.
 

 The second and concomitant principle is that, for purposes of determining the presence of effect on interstate commerce, not only the impact of a particular instance of regulation, but a projection of the cumulative burden that would result if similar regulations were adopted elsewhere is to be considered. On that premise, in upholding, in the
 
 Fry
 
 case, presidential authority under anti-inflation legislation to rescind wage raises granted to less than one one thousandth of the Nation’s labor force, the Supreme Court observed, “Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States”
 
 (Fry v United States,
 
 421 US 542, 547,
 
 supra;
 
 accord
 
 Wickard v Filburn, supra,
 
 at p 129).
 

 Without going any further for the purposes of this opinion, where a State regulation thus indirectly imposes a burden on commerce, it will be subject to constitutional scrutiny and will not be upheld unless its impact is reasonable when weighed against an important State interest which cannot be realized through less burdensome means.
 
 [2]
 
 Against this frame of reference, that in this case the town’s ordinance affects interstate commerce is inescapable. It is undisputed that, but for the ordinance, plaintiff would serve out-of-State as well as other out-of-town enterprises.
 

 The impermissible burden it thus casts becomes evident when it is compared with statutes which were held to be tolerable under the commerce clause despite the fact that their local regulatory purpose projected an incidental effect on interstate commerce. In
 
 Head v New Mexico
 
 (374 US 424), for example, the application to an out-of-State advertiser of a statute forbidding all advertising of optical
 
 *677
 
 goods on the basis of price was sustained because the ban fell equally upon citizens and noncitizens of the enacting State. Again, in
 
 Huron Cement Co. v Detroit
 
 (362 US 440), an incidental effect upon a visiting out-of-State ship was held not to require invalidation of a city’s smoke abatement ordinance that indiscriminately affected everyone, resident or transient alike.
 

 Furthermore, “the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved,
 
 and
 
 on whether it could be promoted as well with a lesser impact on interstate activities”
 
 (Pike v Bruce Church,
 
 397 US 137, 142; emphasis added). On that basis, when the effect of a statutory scheme is to make exclusion do the work of inspection in protecting a State’s or city’s residents from unwholesome milk, it has been declared unconstitutional on the ground that, given the possibility off inspection, the local interest could equally well be served by means far less disruptive of interstate commerce (e.g.,
 
 A & P Tea Co. v Cottrell,
 
 424 US 366, 377;
 
 Dean Milk Co. v Madison,
 
 340 US 349, 355-356).
 

 Consequently, bearing in mind that conservation of the landfill for use by the town’s own residents is not in itself a constitutionally acceptable goal
 
 (Philadelphia v New Jersey,
 
 437 US 617, 629,
 
 supra;
 
 cf.
 
 Hughes v Oklahoma,
 
 441 US 322,
 
 supra),
 
 the ordinance as applied here would not meet the less-burdensome-alternative analysis. Obviously, the only legitimate goal — protection of community health— might have been adequately effected, as in the milk cases, through such means, for example, as inspection carried out either by town officials or by the State Department of Environmental Conservation, or through nondiscriminatory, across-the-board limitation on the quantity, type or state of waste to be deposited or excluded. Instead, the path the town took was to regulate garbage on no criterion except its place of origin. In the absence of a reason, apart from its origin, to treat the out-of-town garbage differently from an equivalent quantity of the local product — and none is suggested— in actual operation respondent’s ordinance violates the principle of nondiscrimination imposed by the commerce clause. This it may not do.
 

 
 *678
 
 For all these reasons,
 
 [3]
 
 the order of the Appellate Division should be reversed, with costs, and the case remitted to the Supreme Court, Ulster County, for entry of a judgment in accordance with this opinion.
 

 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Waghtler and Meyer concur.
 

 Order reversed, etc.
 

 [1]
 

 . Dutchess also held additional acreage in the town in reserve for the future needs of its business.
 

 [2]
 

 . The ordinance here, like other local legislation, was enacted in the exercise of a delegation of State power, in this instance pursuant to the authority granted by section 130 of the Town Law. For present purposes, it therefore stands on the same footing as though the State Legislature itself had adopted the ordinance under attack here.
 

 [3]
 

 . Additionally, three Judges of the court would hold the ordinance invalid, not only in effect, but facially as well (see
 
 Monroe-Livingston Sanitary Landfill v Town of Caledonia,
 
 51 NY2d 679, decided herewith).